IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GEORGETOWN YACHT BASIN, INC. | : | CIVIL ACTION |
| v. | : | |
| M/V *FOURTH PAWN,* et al. | : | NO. 04-4281 |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACOB P. HART                                                                       DATE:   October 12, 2006
UNITED STATES MAGISTRATE JUDGE

I. Introduction

In this case Georgetown Yacht Basin, Inc., (GYB), a business engaged in operating a marina and marine repair facility, has sued James T. King and his boat, *in rem*, for breach of contract and under the Maritime Lien Act, 46 U.S.C. § 31341 et seq.  It seeks to recover the cost of repairs it performed upon the boat.

On July 18, 2006, this case was tried for several hours before the Honorable Bruce W. Kauffman, to whom this case was originally assigned.  After some testimony was taken, however, the parties engaged in settlement negotiations before the Judge.  When the case failed to settle, Judge Kauffman referred this case to the undersigned with the consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  The case was tried before me to its conclusion on September 8, 2006, without the presence of a jury

As explained in the Findings of Fact and Conclusions of Law below, I find in favor of Georgetown Yacht Basin, Inc., and will enter judgment in its favor in the amount of $7,253.02.

II.     Findings of Fact

On or about June 17, 2003, defendant James T. King came to the offices of GYB, asking that they examine his boat to determine the cause of a chattering noise and vibration in the outdrive.  Testimony of Ralph O. Hall, July 18, 2006, Transcript at 4-5.  Mark Ranger, a GYB mechanic, accompanied Mr. King to the marina where his boat was docked, and brought it to GYB, where the outdrive was removed and examined.  Id. at 7.

GYB found that some gears in the upper housing were damaged, and that there was corrosion in the lower housing.  Testimony of Ralph Hall, July 18, 2006 Transcript at 7; September 8, 2006, Transcript at 51.

During this encounter, GYB prepared a Repair Order Request.  Plaintiff's Exhibit 1.  Near the top of the form, the date of 6/17/03 is set forth, and, below that, a box marked T&M is marked with an "x."  Id.  The blank center of the form contains this handwritten note:  "The out drive is making a chattering noise and a bad vibration determine what is wrong and go over with owner and make ness. repairs."  Below this, also handwritten, appears this comment:  "Call Merc warranty should be covered."  Id.

Beneath the handwritten portion of the form are a number of pre-printed conditions set forth in very small, though legible, type, including the following:

> Owner agrees that when the "T&M" block above is marked, the Repairs shall be performed and invoiced on a TIME and MATERIALS basis and that Owner will pay for labor at the prevailing rates for each workperson's skills.

Id.

Another section of the conditions reads:

> Owner agrees all invoices are due and payable upon presentation. Further, Owner agrees to pay LATE CHARGES which are computed at the rate of TWO (2%) PERCENT per month (24% per annum) applied to all invoices that are dated prior to one full monthly accounting cycle. Should collection become necessary owner agrees to pay a COLLECTION FEE equal to ONE THIRD (1/3) of all invoice balance plus late charges, court costs and other expenses that may be expended by GYB and/or its attorney during the collection process. In any event, the minimum fee shall be $200.00.

Id. At the bottom of the conditions is a line in larger type reading:

AGREED BY X _____.  King's signature is on the blank line.  Id.

King testified before the undersigned that the box marked "T&M" was not checked at the time he signed the form, and that, in fact, the form was completely blank. September 8, 2006, Transcript at 35. However, I do not credit this testimony. It is unlikely that a customer would sign a blank repair order, and, since the amount to be charged is not set forth on this form, it is not clear what motive GYB would have in asking King to sign one.

Nevertheless, Ralph O. Hall, GYB's vice-president, testified that he told King that MerCruiser, the manufacturer of the outdrive, was likely to cover the corrosion on the lower housing. July 18, 2006, Transcript at 34. MerCruiser had recently been paying corrosion claims, because its outdrives were defective for having only one mercathode, where they needed two. Id. at 10, 34-35. (A mercathode is a device preventing electrolysis from corroding the metal on the housing of the outdrive; id. at 10).

On June 24, 2003, Mike Anthony, a MerCruiser insurance representative, came to GYB to look at King's outdrive. Id. at 15, 36, and Plaintiff's Exhibit 3. Anthony told Ralph Hall that he thought the outdrive would be covered because of the mercathode issue. Id. at 36.

At Anthony's request, Hall prepared an estimate of the cost of repairs to King's boat. Plaintiff's Exhibit 5.  The estimate included two options.  Id.  The first option involved the replacement of the upper gear housing assembly and rebuilding of the lower gear housing assembly, for a total cost of $7,591.  Id.  The second option proposed the purchase of a rebuilt upper and lower assembly, at a cost of $8,586.79.  Id.  The estimate is dated July 3, 2003.  Id.  GYB forwarded this estimate to Mer-Cruiser and to King.  July 18, 2006, Transcript at 11.

In the first few days of July, King called Hall and asked whether his boat would be ready for the Fourth of July weekend.  Testimony of Ralph Hall, July 18, 2006, Transcript at 12.  When he found it would not, he asked whether it could be ready by July 18.  Id.  Hall explained that "the only way that that would happen is if we purchased a – a new drive and installed it."  Id.  He testified:  "And so, he decided that's what needed to be done, so that's what we did."  Id.

When GYB submitted the corrosion claim to MerCruiser, it was denied on the basis that the outdrive had already been replaced because of corrosion in February, 2002, and the second mercathode was not added at that time.  Id. at 15; and see Plaintiff's Exhibit 11.  At the July 18, 2006, trial the following interchange took place:

> THE COURT:  Did you ever tell Mr. King that the Mer warranty was not covered, did you ever notify him of that?
>
> HALL:  I ... I must have had that conversation 'cause I'm sure –
>
> THE COURT:  Well, I'm not asking what you must have had, do you – do you have any recollection?
>
> HALL:  I don't have any recollection, no, sir.
>
> THE COURT:  Before you went forward to get a new one – a new outdrive – had Mr. King been notified that there was no Mer – Mer-Cruiser – warranty?

      HALL:  No.  ...

July 18, 2006, Transcript at 35-36.

      King picked up his boat on July 18, 2003.  September 8, 2006, Transcript at 24.  There was no bill on the boat.  Id.  According to Hall, this was because GYB was still trying to obtain some money from the warranty companies (both MerCruiser, and First Protection Corp., with which King held an after-market warranty).  Id. and Plaintiff's Exhibit 8.

      King, however, assumed from the absence of a bill that his debt to GYB had been paid under one or both of his warranties, since, in the past, he had always been required to pay his bill at the time he picked his boat up after repairs.  King Findings of Fact and Conclusions of Law.

      According to GYB's records, it first billed King on September 10, 2003, in the amount of $9,717.48.  Plaintiff's Exhibit 8.  Of this, $950.00 represented labor, and $8,342.40 was for the new outboard.  Testimony of Ralph Hall, July 18, 2006, at 13.  The actual cost to GYB for a new outdrive was $4,898.69.  Plaintiffs' supplemental submission of September 26, 2006.  However, King was charged a retail price, because Mercruiser requires its authorized dealers to do so.  Testimony of Ralph Hall, July 18, 2006, Transcript at 27; September 8, 2006, Transcript at 16.

      On November 5, 2003, GYB once again examined King's boat to determine the source of a noise coming from the new outboard.  Plaintiff's Exhibit 7.  GYB found nothing wrong.  Testimony of Ralph Hall, July 18, 2006, Transcript at 13-14.  It is apparent that, at that time, GYB was still awaiting word from MerCruiser, since all paperwork in connection with the November 5, 2003 bears the notation "Merc Warranty?"

      King testified:  "There was no bill in the boat, there was nothing said until October 28, I got a bill in the mail for $9,900.00.  And then, I started calling them and he would never return

my call. ... But I've called him – it was thirty-three times – my ex-attorney Peter Hess has all my phone records." July 18, 2006, Transcript at 21. On September 8, 2006, he repeated this testimony. Transcript at 48.

This testimony cannot be completely accurate, since it ignores the November 5, 2003, contact between King and GYB. Moreover, it is clear that by November 1, 2003, King knew that MerCruiser had not yet obtained payment under the warranty. Plaintiff's Exhibit 11 is a copy of a November 11, 2003, letter from MerCruiser to King "in reply to [his] November 1 letter." In it, MerCruiser explains the basis for its denial of coverage. Nevertheless, I find it essentially credible that King did not receive a bill until late October, and that he repeatedly tried to discuss the bill with Hall, but was not able to reach him.

King submitted GYB's bill to First Protection Corp. September 8, 2006, Transcript at 48. A check from First Protection Corp. in the amount of $4,716.26 was received by GYB on November 19, 2003. Plaintiff's Exhibit 8; Testimony of Ralph Hall, July 18, 2006, Transcript at 14.

The payment from First Protection Corp. reduced King's balance on GYB records to $5,386.56. Plaintiff's Exhibit 8. However, GYB had already assessed a late fee of $198.09 on October 31, 2003. Id. It continued to assess late fees of $103.76 each month. Id. In accordance with the signed Repair Order Request, GYB has also assessed a collection fee on July 18, 2006, in the amount of $2,971.47; one-third of the August 31, 2006, balance. Additionally, there is a charge to King in the amount of $187.25, for the November 5, 2003, examination. Id. The sum of these charges is $11,885.87. Id. GYB also seeks court filing fees of $150.00 and a service fee in the amount of $101.30. Testimony of Ralph Hall, July 18, 2006, Transcript at 15.

III.     Conclusions of Law

The Repair Order Request constituted a binding contract between the parties. Although both King and GYB originally believed that most or all of the bill would be covered under the MerCruiser warranty, this is not a basis for vitiating the contract as a result of mutual mistake. The doctrine of mutual mistake applies only to known facts that existed at the time the contract was executed and not to predictions of future events, such as MerCruiser's anticipated payment under the warranty. In Re Diet Drugs Products Liability Litigation, 434 F. Supp. 323, 344 (E.D. Pa. 2006).

Moreover, although GYB failed to bill King until October, apparently because it was pursuing payment under the MerCruiser warranty, I cannot conclude that it thereby waived its right to seek payment from King. Waiver is a voluntary and intentional abandonment or relinquishment of a known right, and, although it need not be established by a party's express declaration, it does require "undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary." RCN Telecom Services of Philadelphia, Inc. v. Newtown Township, 848 A.2d 1108, 1113 (Pa. Cwlth. 2004). These are lacking here.

In one New Jersey case, a plaintiff was found to have waived its right to seek additional payment from a party with whom it had contracted, where it failed to bill for the extra amount for two years. Moore's Trucking Co. v. National Starch & Chemical, Civ. No. 93-4750 (GEB), 1994 WL 741081 at ** 3-4 (D.N.J. Sep. 27, 1994). However, GYB's five months delay in billing King, during a time when it had received no payment at all, does not, as in Moore "manifest an acquiescence" to King's subsequent failure to pay. Id.

Similarly, the doctrine of estoppel does not apply. (The Moore court, supra, has explained that estoppel may arise from apparent waiver, even if the intent element of waiver is missing). The party asserting estoppel must show a misrepresentation by another party, upon which he reasonably relied to his detriment. Dipeppe v. Quarantillo, 337 F.3d 326, 335 (3d Cir. 2003); U.S. v. Asmar, 827 F.2d 907, 912 (3d Cir. 1987). GYB mistakenly told King that it believed the MerCruiser warranty would apply, but it never led King to believe that he would not be billed for any amounts not covered.

Moreover, there is no legal basis for preventing GYB from charging King a retail price for the new outdrive. For that reason, I find that King is liable to GYB under the Repair Order Request for time and materials, as specified in the contract. The Repair Order Request also gives GYB the right to costs, and a one-third collection fee.

Nevertheless, it is clear that GYB has no contractual right to assess late fees between June and November, 2003. King only received a bill at the end of October. Moreover, it is apparent that GYB acceded to King's failure to pay in the month of November, because of its continued hope of recovering under the MerCruiser warranty. This is shown by the fact that GYB was willing to do further work on King's boat on November 5, 2003, despite the fact that it had received no payment for the earlier work, and by the "Merc Warranty?" notation on the paperwork from that date.

Further, GYB has not shown that it actually mailed bills to King between the time it first billed him and the time of trial. There is no testimony to this effect, and GYB has not submitted copies of invoices. The Account Activity Summary it has provided sets forth invoice numbers for monthly bills up through June 30, 2004. Plaintiffs' Exhibit 8. Entries between July 31, 2004,

and August 31, 2006, however, each adding a separate late fee of $103.76, do not even have invoice numbers.  Id.

For this reason, I will deduct the $3,725.93 in late fees from the sum owed by King to GYB.  I will also reduce the one-third collection fee to account for the removal of the late fees.  I conclude, therefore, that King is liable to GYB in the amount of:

| | |
|---|---|
| Time and materials for the initial repairs | $5,001.02 ($9,717.48 minus the $4,716.26 payment from FPC) |
| Time and materials for November 5, 2003 repairs | $  187.25 |
| Court filing fee | $  150.00 |
| Service fee | $   101.30 |
| | $5,439.77 |
| Collection fee | $1,813.25 |
| **TOTAL:** | **$7,253.02** |

Since GYB has shown that it provided necessaries to the *M/V FOURTH PAWN*, it has demonstrated the right to a maritime lien against the boat, under 46 U.S.C. § 31342.  Although interest and attorney's fees are sometimes awarded in maritime cases, (see Adriatic Ship Supply Co., Inc. v. Shaula, 632 F. Supp. 1573 (E.D. Pa. 1986) and Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp., 598 F. Supp. 45, 48 (D.V.I. 1984), *aff'd mem.*, 760 F.2d 257 (3d Cir. 1985)), I will not award them here, since I have not made a finding of bad faith against King, and because the costs and collection fee to which GYB has a contractual right are ample to compensate it.

In accordance with this decision, I now enter the following Order of Judgment:

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GEORGETOWN YACHT BASIN, INC.      :     CIVIL ACTION

    v.                                :

M/V *FOURTH PAWN,* et al.         :     NO. 04-4281

ORDER OF JUDGMENT

JACOB P. HART                              DATE:   October 12, 2006
UNITED STATES MAGISTRATE JUDGE

    I hereby ENTER JUDGMENT:

In favor of Plaintiff, Georgetown Yacht Basin, Inc., in the amount of $7,253.02; and I further ORDER that Plaintiff has demonstrated the right to a maritime lien against *M/V FOURTH PAWN* in that amount.

BY THE COURT:

/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE